IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ROSA SMAJLAJ, et al.,                :      HON. JEROME B. SIMANDLE

                  Plaintiffs,        :      Civil No. 10-1332 (JBS/AMD)

        v.                           :

CAMPBELL SOUP COMPANY &              :          **OPINION**
CAMPBELL SALES COMPANY,              :

                  Defendants.        :

APPEARANCES:

Jeffrey W. Herrmann, Esq.
COHN, LIFLAND, PEARLMAN, HERRMANN & KNOPF, LLC
Park 80 West Plaza One
250 Pehle Avenue, Suite 401
Saddlebrook, NJ 07663
        -and-
Lester L. Levy, Esq.
Michele F. Raphael, Esq.
WOLF POPPER LLP
845 Third Avenue, 12th Floor
New York, NY 10022
        Counsel for Plaintiffs

Robert Alan White, Esq.
MORGAN, LEWIS & BOCKIUS, LLP
502 Carnegie Center
Princeton, NJ 08540
        -and-
J. Gordon Cooney, Jr., Esq.
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market St.
Philadelphia, PA 19103
        Counsel for Defendants

**SIMANDLE,** District Judge:

## I.  INTRODUCTION

This putative class action is before the Court on Defendants' motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  [Docket Item 15.]  Plaintiffs allege that they are consumers who were misled by the labels on cans of Campbell's less-sodium tomato soups, as well as Campbell's website and other marketing, into buying cans of the higher-priced less-sodium soups even though the sodium content of those soups was equal or nearly equal to that of Campbell's regular tomato soup.  Defendants seek to dismiss the claims, arguing that claims based on nutritional labeling are preempted by the Federal Food, Drug, and Cosmetic Act (FDCA), maintaining that the soup labels and marketing information were not misleading as a matter of law, and contending that Plaintiffs received a product worth its price and therefore suffered no loss.  The two principal issues are: whether Plaintiffs' claims are preempted because they would impose requirements on Defendants that are different from what the FDCA requires; and whether the allegations in the Amended Complaint are sufficient to plead an "ascertainable loss," as required for a claim under New Jersey's Consumer Fraud Act.  As explained in today's Opinion, the Court finds that Plaintiffs'

2

claims are not preempted because they do not impose requirements on Defendants that are not imposed by the FDCA.  The Court also finds that Plaintiffs sufficiently plead claims under both the Consumer Fraud Act and New Jersey's common law of express warranties.

## II.  BACKGROUND

     Plaintiffs are consumers of Campbell's tomato soups who claim they were misled by claims made with respect to Campbell's less-sodium tomato soups.  They putatively represent a class defined as "[a]ll persons residing in the United States who purchased Campbell's 25% Less Sodium Tomato Soup and/or 30% Less Sodium Healthy Request Tomato Soup at anytime from September 1, 2009 to the present" as well as a New Jersey subclass defined as "[a]ll persons residing in the State of New Jersey who purchased Campbell's 25% Less Sodium Tomato Soup and/or 30% Less Sodium Healthy Request Tomato Soup at anytime from September 1, 2009 to the present."  (Am. Compl. ¶¶ 40-41.)  Plaintiffs allege that, during the class period, Campbell's regular tomato soup contained 480 mg of sodium per serving, which is the same amount of sodium that was contained in its 25% Less Sodium Tomato Soup, and only 2% more than the amount contained in the Healthy Request Soup. (Am. Compl. ¶¶ 18, 31.)  During the class period, some labels on cans of both less-sodium soups displayed statements comparing

their sodium content to "OUR REGULAR PRODUCT."  (Am. Compl. ¶¶ 21, 30.)  According to Plaintiffs, consumers who bought those soups were misled into thinking that "OUR REGULAR PRODUCT" referred to Campbell's regular tomato soup that contained 480 mg of sodium.[1]

Additionally, during the class period, some of the cans of the 25% Less Sodium soup were labeled "25% LESS SODIUM THAN REGULAR CONDENSED SOUP," which Plaintiffs claim is misleading in the same way as the other labels.  (Am. Compl. ¶ 23.)  On the side of the label on the less-sodium cans comparing the sodium content to "REGULAR CONDENSED SOUP" is a picture of a can of the regular tomato soup, together with the large-font words "The famous taste . . . with less salt!"  (Am. Compl. ¶ 23.) Underneath that picture and phrase is a small-font explanation that Campbell's regular tomato soup is healthy because it uses sea salt which allows them to use less sodium.  The large-font front-facing claim on this version of the 25% less sodium label also contains a footnote, printed on the reverse side in fine print, which expands on the 25% comparison statement by saying, "This product contains 480 mg of sodium versus an average of 830

---

[1]  The Amended Complaint alleges that the comparison on the 25% Less Sodium labels bearing the phrase "OUR REGULAR PRODUCT" is actually a comparison to an "undefined, hodge podge" of Campbell's other soups, (Am. Compl. ¶¶ 22, 25), but the Amended Complaint does not make any allegation about the intended comparator of the Healthy Request soups.

mg for our regular condensed soup." (Am. Compl. ¶ 23.)

Plaintiffs also identify other sources of allegedly misleading statements. They allege that Campbell's website was misleading because it displayed the 25% Less Sodium Tomato Soup together with the regular tomato soup, leading consumers to believe that the 25% Less Sodium Tomato Soup had 25% less sodium than the regular tomato soup. (Am. Compl. ¶ 27.) Plaintiff Velez alleges that she purchased cans of the 25% Less Sodium soup "after viewing misleading statements and representations on the labels of the cans and Campbell's website which led her to believe that the Campbell's 25% Less Sodium Tomato Soup had 25% less sodium than Campbell's regular tomato soup." (Am. Compl. ¶ 7.) Plaintiffs also allege that Campbell's marketing materials misleadingly implied that the alternative soups contained substantially less sodium than the regular tomato soup. (Am. Compl. ¶ 33.)

Although it concerns matters outside the pleadings and therefore, as explained further in today's Opinion, is irrelevant for this Rule 12(b)(6) dismissal motion, it is helpful to be aware of some additional facts alleged by Defendants in order to better understand their position. According to Defendants' counsel, in September 2009 Campbell had only recently released the version of the regular tomato soup with a sodium content of 480 mg. That reformulated regular soup replaced an older regular

soup, which had 710 mg of sodium.  Defendants represent that Campbell simultaneously released newly labeled versions of the alternative soup lines, such that the Healthy Request soup no longer made any comparison statements, and the 25% Less soup began to use the comparison to "REGULAR CONDENSED SOUP."  They also claim that the comparisons to "OUR REGULAR PRODUCT" were not comparisons to a hodge podge of soups, but were accurate comparisons to the old formulation of the regular tomato soup.

Plaintiffs bring two claims against Campbell Soup Company and Campbell Sales Company based on Plaintiffs' allegations that they were misled into paying for more expensive soup even though it did not contain less sodium than the cheaper alternative which was identical for their purposes.  The first is a claim under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, which prohibits among other things "misrepresentation . . . in connection with the sale or advertisement of any merchandise." N.J. Stat. Ann. § 56:8-2, 56:8-1(c),(e).  The second claim is a breach of express warranty claim, based on the labels' representations regarding the relative sodium contents of the soups.  Plaintiffs also seek injunctive relief, which they mistakenly characterize as a cause of action.

The named Plaintiffs who remain in the case are four New Jersey residents:  Diane Semon, Wendy Kates, Christine Velez, and Barbara Doster.  A fifth named Plaintiff from New York, Rosa

Smajlaj, voluntarily dismissed her claims.  [Docket Item 17.]
Although the remaining named Plaintiffs are citizens of the same
state as Defendants, many members of the proposed class are
citizens of other states, providing this Court jurisdiction under
28 U.S.C. § 1332(d)(2).

## III.  DISCUSSION

### A.  Standard

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure,
a pleading that states a claim for relief need only contain "a
short and plain statement of the claim showing that the pleader
is entitled to relief."  Rule 8(a)(2), Fed. R. Civ. P.  To the
extent that Plaintiffs' claims sound in fraud or
misrepresentation they "must state with particularity the
circumstances constituting fraud."  Rule 9(b), Fed. R. Civ. P.

In deciding Defendants' motion to dismiss, the Court must
look to the face of the complaint and decide, taking all of the
allegations of fact as true and construing them in a light most
favorable to Plaintiffs, whether the Amended Complaint contains
"sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'"  Ashcroft v. Iqbal,
129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly,
550 U.S. 544, 570 (2007)); Fowler v. UPMC Shadyside, 578 F.3d
203, 210 (3d Cir. 2009).  A plaintiff is obligated to "provide

the 'grounds' of his 'entitle[ment] to relief,'" which requires
more than "labels and conclusions," but he is not required to lay
out "detailed factual allegations," Twombly, 550 U.S. at 555
(quoting Papasan v. Allain, 478 U.S. 265, 286 (1986), except to
the extent required in this case by Rule 9(b), Fed. R. Civ. P.  A
complaint must contain facially plausible claims, that is, a
plaintiff must "plead factual content that allows the court to
draw the reasonable inference that the defendant is liable for
the misconduct alleged." Twombly, 550 U.S. at 556.

Only the allegations in the Amended Complaint, matters of
public record, orders, and exhibits attached to the Amended
Complaint are taken into consideration.  Chester County
Intermediate Unit v. Pennsylvania Blue Shield, 896 F.2d 808, 812
(3d Cir. 1990).  The Court will therefore consider, without
objection, five cans of soups marked at oral argument, Exs. P-1 &
2 and Exs. D-1, 2 &3, since each label is referred to in the
Amended Complaint.

However, the Court will not consider the representations
made by Campbell about the existence of and timing of the release
of the reformulated regular soup and the dates of the changed
labels of the alternative soups.  The Amended Complaint neither
refers to nor relies upon this information.  Indeed, the Amended
Complaint does not even mention the changes that Defendants
allege occurred.  Consideration of these purported facts is not

8

warranted by the content of the Amended Complaint.

At oral argument, Defendants maintained that the factual context of the labeling change and its timing may be considered by the Court under the Supreme Court's decision in Iqbal, because that case endorsed this Court's reliance on its "judicial experience and common sense," and in that case the Supreme Court relied on various facts about the terrorist attacks of September 11, 2001 including that "[t]he September 11 attacks were perpetrated by 19 Arab Muslim hijackers who counted themselves members in good standing of al Qaeda, an Islamic fundamentalist group." Iqbal, 129 S. Ct. at 1950-51.  Assuming for the sake of argument that Iqbal was endorsing the Court's consideration of certain facts outside the pleadings, the Court is not persuaded that the existence and timing of Campbell's release of a newly formulated tomato soup is akin to the general knowledge that the September 11, 2001 hijackers were Arab Muslims.  The various representations made by Defendants' counsel are not appropriately considered when examining the sufficiency of the Amended Complaint under Rule 12(b)(6).

**B.  Preemption**

  1.  FDCA's preemption of non-identical nutritional
  labeling requirements

The Federal Food, Drug, and Cosmetic Act (FDCA) empowers the Food and Drug Administration (FDA) to protect the public health

by ensuring that "foods are safe, wholesome, sanitary, and properly labeled."  21 U.S.C. § 393(b)(2)(A).  A food is not properly labeled if its labeling "is false or misleading in any particular."  21 U.S.C. § 343(a).

In 1990, Congress amended the FDCA by enacting the Nutrition Labeling and Education Act (NLEA), which altered, expanded, and clarified the labeling requirements of the FDCA.  See 21 U.S.C. §§ 301, 321, 337, 343, 371.  The 1990 amendments expressly preempt inconsistent state nutritional content labeling requirements.  21 U.S.C. § 343-1(a)(1)-(5).  Under the preemption provision, a state may not impose any requirement respecting any claims of nutritional content on labels "that is not identical to the requirement" imposed by the Act.  § 343-1(a)(5).[2]

However, the purpose of the NLEA was not to preclude all state regulation of nutrition labeling, but instead to "prevent State and local governments from adopting inconsistent requirements with respect to the labeling of nutrients."  H. Rep. No. 101-538 at 10, reprinted in 1990 U.S.C.C.A.N. 3336, 3337. State laws are not preempted so long as the requirements they impose on labeling are identical to the requirements of the FDCA. See § 343-1(a)(5) (prohibiting requirements that are not

---

[2]  There is no implied preemption resulting from the Act since Congress declared that "[t]he Nutrition Labeling and Education Act of 1990 shall not be construed to preempt any provision of State law, unless such provision is expressly preempted."  101 Pub. L. 535, 104 Stat 2353, 2364 (Nov. 8, 1990).

identical); 60 Fed. Reg. 57076-01, 57120 (Nov. 13, 1995) ("[I]f the State requirement is identical to the Federal law, there is no issue of preemption."); Vermont Pure Holdings, Ltd. v. Nestle Waters North America, Inc., No. Civ. A. 03-11465 DPW, 2006 WL 839486, at *5 (D. Mass. Mar. 28, 2006); Reyes v. Mcdonald's Corp., Nos. 06 C 1604, 06 C 2813, 2006 WL 3253579, at *6 (N.D. Ill. Nov. 8, 2006); Ackerman v. Coca-Cola Co., No. CV-09-0395 (JG)(RML), 2010 WL 2925955, at *6 (E.D.N.Y. July 21, 2010).  When the state statute or cause of action would impose a requirement that is not the same as the federal requirement then it is preempted.  See, e.g., Mills v. Giant of Maryland, LLC, 441 F. Supp. 2d 104, 108 (D.D.C. 2006) (finding that requirement of warning on milk products regarding lactose intolerance exceeds the requirements of the NLEA and is preempted); In re PepsiCo, Inc., Bottled Water Marketing and Sales Practices Litigation, 588 F. Supp. 2d 527, 536 (S.D.N.Y. 2008) (holding that requirement of disclosure that purified water was from tap water rather than other sources went beyond the requirements of disclosure set forth by the NLEA).

As explained below, because Plaintiffs' claims mirror the federal requirements, they are not preempted.[3]

---

[3] Since the Court finds that the claims based on the labels themselves are not preempted, the Court need not reach the question of whether the claims based on the website's display of can labels would be preempted as a consequence of the claims based on the labels themselves being preempted.

2.   <u>Requirements imposed by Plaintiffs' claims</u>

Section 343(r) of the FDCA defines when a food is improperly labeled because of information contained on its label regarding nutrition levels and health-related claims.  § 343(r). Subsection 343(r)(1) applies to claims on labels about the level of certain nutrients, including sodium.  Generally, nutrient-level claims constitute misbranding unless they follow the regulations promulgated by the FDA.  § 343(r)(2)(A).

The FDA's regulations for claims about sodium levels permit the use of the term "less sodium" when "[t]he food contains at least 25 percent less sodium per reference amount customarily consumed than an appropriate reference food as described in § 101.13(j)(1)" and "[t]he identity of the reference food and the percent (or fraction) that the sodium differs from the labeled food are declared in immediate proximity to the most prominent such claim."  21 C.F.R. § 101.61(b)(6); 21 C.F.R. § 101.13(j). This case involves Campbell's allegedly misleading identification of their chosen reference food.

The fundamental problem the FDA faced in crafting regulations for food labels comparing one food to another food was preventing manufacturers from making claims of relative nutrient values in comparison to a product that was unlikely to present a genuine alternative purchasing choice.  In particular, the FDA faced three discrete types of misleading comparisons:

12

(1) comparisons to foods that do not represent a choice between two interchangeable foods (for example, a comparison between apples and steak); (2) comparisons to foods formulated solely so that the healthier version might be sold as an attractive comparator (for example, comparison to a manufacturer's formulation of a pound cake that was never widely sold but contained 50% more sodium than the "less sodium" version); and (3) comparisons to the least healthy, but unrepresentative example of a food (for example, a comparison to the generic food "potato chips" which uses as the basis for comparison a particularly high-sodium formulation of potato chips that is not representative of potato chips generally).  See 56 Fed. Reg. 60421-01, 60446 (Nov. 27, 1991).

To address the first problem involving the interchangeability of the compared foods, the FDA required that to be an appropriate reference food for claims that a food contains more or less of a nutrient, the food must be "a dissimilar food within a product category that can generally be substituted for one another in the diet (e.g., potato chips as reference for pretzels, orange juice as a reference for vitamin C tablets) or a similar food (e.g., potato chips as reference for potato chips, one brand of multivitamin as reference for another brand of multivitamin)."  § 101.13(j)(1)(i)(A).  And to prevent misleading comparisons to specially-formulated or non-

13

representative foods, the FDA concluded that an appropriate reference food is the manufacturer's regular brand, another manufacturer's regular brand, or a representative value for a broad base of foods of the particular type.  58 Fed. Reg. 2302-01, 2362 (Jan. 6, 1993) (codified at § 101.13(j)(1)(ii)(A), (B)).

If a manufacturer elects not to use a particular brand of food as a reference food, the generic comparator must "be representative of the type of food that includes the product that bears the claim."  § 101.13(j)(1)(ii)(A), (B).  That way, for example, a manufacturer of Italian salad dessing cannot choose a particularly unhealthy formulation of Italian salad dressing as a comparator.  To ensure that the reference food is not misleading, the FDA required that "the nutrient value for the reference food shall be representative of a broad base of foods of that type; e.g., a value in a representative, valid data base; an average value determined from the top three national (or regional) brands, a market basket norm; or, where its nutrient value is representative of the food type, a market leader."  § 101.13(j)(1)(ii)(A), (B).  The regulation provides that "[f]irms using such a reference nutrient value as a basis for a claim, are required to provide specific information upon which the nutrient value was derived, on request, to consumers and appropriate regulatory officials."  § 101.13(j)(1)(ii)(A).

Alternatively, a manufacturer may choose to make a

comparison to the manufacturer's regular brand, or another
manufacturer's regular brand.  As explained above, the language
regarding "regular brand" or "regular product" was an attempt to
resolve the problem of misleading comparisons involving products
that were never really sold, so it was defined as a food "that
has been offered for sale to the public on a regular basis for a
substantial period of time in the same geographic area by the
same business entity or by one entitled to use its trade name."
§ 101.13(j)(1)(ii)(A), (B).  The regular product is to be a
"known specific food," that has been on the market long enough
for consumers to be familiar with it.  56 Fed. Reg. 60421-01,
60446 (Nov. 27, 1991).  Thus, the Italian dressing maker may
elect to compare its newly formulated Italian dressing to its
regular Italian dressing, or its specifically-named competitor's
Italian dressing, so long as the comparator product "has been
offered for sale to the public on a regular basis for a
substantial period of time."  § 101.13(j)(1)(ii)(A), (B).

Plaintiffs assume for the sake of argument that Campbell is
permitted to use an average of unidentified condensed soups as a
reference food.  This is a generous assumption since, contrary to
what Campbell repeatedly and incorrectly asserts, the regulations
do not expressly permit a reference food that is actually a

category of foods.[4]  The regulation only discusses food

categories when stating that a reference food may be "a

dissimilar food within a product category" § 101.13(j)(1)(i)(A),

but being within a category is different from being an entire

category.

Even the informal information sheet relied upon by

Defendants does not contemplate comparison to an entire category

of foods.  The FDA guidance states:

> How would a label state the identity of a
> reference food when the nutrient value used as
> a reference for the claim was from a data base
> or was an average of several foods?
>
> Answer: The label might state "50% less fat
> than regular Italian salad dressing" (on a
> light Italian dressing) or "half the fat of
> the average creamy Italian salad dressing" (on
> a light creamy Italian salad dressing). The
> label is not required to state that the
> reference value came from a data base. 21 CFR
> 101.13(j)(2)(i).

FDA Food Labeling Guide, Section VIII, Question No. 35 (April

2008), available at http://www.fda.gov/Food/

GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLab

---

[4]  Counsel for Campbell goes so far as to place quotation
marks around statements not found in the regulations. (Defs.'
Rep. Br. 1 ("FDA regulations expressly permit Campbell to make a
'less sodium' comparison to a single food or a 'category of
soup.'); Defs.' Br. 10 ("The 'reference' food can be a
category of foods (emphasis added)" [emphasis and parenthetical
indicating emphasis added in original].))  As indicated above, no
part of the regulations states that a reference food may be a
category of foods, nor do the regulations use the phrase
"category of foods," as Defendants mistakenly quote it.

elingNutrition/FoodLabelingGuide/ucm064908.htm.  This Question
and Answer discusses comparison to a representative sample of
Italian salad dressings in conformance with the FDA's concern
that a <u>specific</u> reference food, Italian salad dressing, be
representative of its type, by taking an average of Italian salad
dressings.  <u>See</u> <u>id.</u>  There is no doubt that Campbell could have
compared their less-sodium tomato soup to an average of condensed
<u>tomato</u> soup, which is the proposition endorsed by the FDA's
question and answer sheet.  That is very different from the
position that Campbell can compare their less-sodium tomato soup
to a hodge podge of their higher-sodium condensed soups.  The
most that could be said for Defendants' interpretation of the
regulations is that the regulations do not expressly forbid using
a category of foods as a reference food.  However, given the
dramatic variance in the ingredients of various mixtures
considered soups, it is unclear whether "condensed soup" as a
reference to many different kinds of soup which are averaged, is
an appropriate reference food under § 101.13(j).  The comparison
to an average of condensed soups is akin to comparing a
particular frozen meal to frozen meals generally, as if the fact
that they are all frozen makes the comparison useful to the
consumer.

    Plaintiffs, however, do not quarrel with the selection of an
average of condensed soups as a reference food, except insofar as

the unusual reference makes it less likely for a consumer to have read the labels as Campbell claims they intended.  Plaintiffs' complaint is about the misleading identification of the selected reference food as "OUR REGULAR PRODUCT" or "REGULAR CONDENSED SOUP" when it in fact was a hodge podge of soups.  Plaintiffs maintain that the regulation's requirement that "[t]he label or labeling must state the identity of the reference food" requires that Campbell identify the reference food in a way that is not misleading, especially given that the background prohibition under § 343(a) is against labeling that "is false or misleading in any particular . . . ."  21 U.S.C. § 343(a).

Plaintiffs' assertions are consistent with the FDA requirements.  According to the FDA, a company may be in violation of the reference food regulations even if it has used the comparison language suggested by the FDA, if the company exercises poor judgment in avoiding claims that are misleading because of their "overall context or presentation."  58 Fed. Reg. 2302-01, 2363 (Jan. 6, 1993).[5]

--------

[5]  The FDA writes in describing the final rule:

> In addition, the agency points out that the 1990 amendments repeatedly state that claims provided for in this regulation and other regulations promulgated under this statute must not be misleading (e.g., section 403(r)(2)(A)(vi) of the act and section 3(b)(1)(A)(iii) of the 1990 amendments).  In these regulations, FDA has attempted to provide clear guidance to manufacturers on how

Plaintiffs, consistent with FDA's regulations, allege that it is misleading to identify a composite of condensed soups as "REGULAR CONDENSED SOUP" juxtaposed with a picture of regular tomato soup and the phrase "The famous taste . . . with less salt!"[6]  This cause of action is consistent with and requires

--------

to state claims and on what foods are appropriate as reference foods. However, these provisions do not mandate precise phrasing for each permissible claim. Particularly for use of dissimilar foods as reference foods, the regulation does not specify what "product category" means. The agency has intentionally used a flexible standard. This flexibility is intended to facilitate useful comparisons on foods that are generally interchangeable in the diet (for example, "apples have less fat than potato chips") while prohibiting meaningless or misleading claims. As a consequence, manufacturers will have to use judgment in developing claims to ensure that the claims comply with the regulations and are not misleading under section 403(a) of the act. The agency advises that it will determine on a case-by-case basis whether a claim is misleading because its overall context or presentation is misleading.

58 Fed. Reg. 2302-01, 2363 (Jan. 6, 1993).  Defendants do not argue that their labels were actually approved by the FDA.

[6]  The footnote on this claim, referring to "an average of our regular condensed soup," does not render implausible the allegation that the claim is misleading. The FDA requires the identification of the reference food to appear in close proximity to the percentage claim.  21 C.F.R. § 101.61(b)(6).  Moreover, even this fine print explanation confusingly uses the singular "soup," when it refers to a composite of soups.  It also states that the 25% less sodium soup has 480 mg of sodium compared to 830 mg for the "condensed soup," a difference of much greater than 25%, reasonably leading to confusion.

nothing more than the FDA's requirement that the reference food
be non-misleadingly identified.  § 101.13(j)(2)(i); 58 Fed. Reg.
2302-01, 2363 (Jan. 6, 1993).  This depiction of the image of
regular tomato soup may plausibly suggest to a reasonable
consumer that Campbell is representing that its 25% Less Sodium
Tomato Soup contains 25% less sodium than its regular tomato
soup, which is untrue for the formulation of the regular tomato
soup at issue here.  Similarly, Plaintiffs allege that the labels
referring to "OUR REGULAR PRODUCT" also referred to a hodge podge
of soups, and that this was misleading; it is plausible that a
reasonable consumer could believe that the comparison to "OUR
REGULAR PRODUCT" is drawing a comparison to Campbell's regular
tomato soup then being sold.  That claim is consistent with the
requirements of the act that identification of the reference food
not be misleading.  If Plaintiffs' allegations are proven, state
liability may be imposed consistently with the federal
regulation.[7]

---

[7] Since Defendants' allegations regarding the existence and
timing of the reformulated regular tomato soup and new labels are
not before the Court, the Court does not reach the question of
whether the FDCA preempts a claim based on labeling that is
misleading solely as a consequence of the release of a new
"regular product" while old products still being sold continue to
bear labels making comparisons to the product being phased out.
It is not obvious that such a claim would be preempted, nor is it
clear that any of Plaintiffs' claims rely solely on that theory
of how the labels are misleading, since Plaintiffs argue that
even the label that Defendants claim is new is misleading.  The
Court also need not reach Plaintiffs' alternative framing of
their argument, which maintains that the regulations are silent

The FDCA does, however, preempt Plaintiffs' claims regarding omission of information.  Plaintiffs argue that even assuming the comparison on the labels is not misleading in and of itself, the labels are still misleading because Campbell failed to also disclose a comparison to their regular tomato soup in addition to a comparison to the average of some or all of their regular condensed soups.  This version of the claim is clearly preempted because the regulations only require the non-misleading identification of a proper reference food; they do not require the disclosure of any additional comparisons.  See In re PepsiCo, Inc., 588 F. Supp. 2d at 536.

In summary, the Court holds that Plaintiffs' claims that Defendants' labels for Campbell's 25% Less Sodium Tomato Soup and 30% Less Sodium Healthy Request Soup are misleading are not preempted by the FDCA because the FDCA requires non-misleading identification of the reference food.  Conversely, Plaintiffs' claims that such labels omit material information regarding sodium are preempted by the FDCA because Plaintiffs would have this Court impose a labeling requirement for the nutrient content of sodium that is inconsistent with the FDA's nutritional labeling regulations, and these latter claims must therefore be dismissed as preempted.

---

on how exactly to identify the reference food, and are therefore not preemptive.

### C.  New Jersey Consumer Fraud Act (NJFCA)

The Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, is designed to address "sharp practices and dealings in the marketing of merchandise and real estate whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or advertising practices." Daaleman v. Elizabethtown Gas Co., 390 A.2d 566, 569 (N.J. 1978).  To state a claim under the Act, Plaintiffs must allege sufficient facts to demonstrate: (1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the unlawful conduct and the ascertainable loss.  International Union of Operating Engineers Local No. 68 Welfare Fund ("IUOEL 68") v. Merck & Co., 929 A.2d 1076, 1086 (N.J. 2007).[8]  Unlawful conduct falls into three general categories: affirmative acts, knowing omissions, and violation of regulations promulgated under the Act.  N.J. Stat. Ann. §§ 56:8-2, 56:8-4.  The Act is "remedial legislation which should be construed liberally." IUOEL 68, 929 A.2d at 1079 n.1.

Rule 9(b) of the Federal Rules of Civil Procedure applies to

---

[8]  The Act imposes liability on any person who uses:  "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission."  N.J. Stat. Ann. § 56:8-2.

claims under the Consumer Fraud Act.  See F.D.I.C. v. Bathgate,
27 F.3d 850, 876-77 (3d Cir. 1994) (affirming district court's
application of Rule 9(b) to Consumer Fraud Act claim); Naporano
Iron & Metal Co. v. American Crane Corp., 79 F. Supp. 2d 494, 510
(D.N.J. 2000); Harper v. LG Electronics USA, Inc., 595 F. Supp.
2d 486, 491 (D.N.J. 2009); Warma Witter Kreisler, Inc. v. Samsung
Electronics America, Inc., Civil No. 08-5380(JLL), 2009 WL
4730187, at *5 (D.N.J. Dec. 3, 2009).[9]  Rule 9(b) requires that
Plaintiffs set forth the particular factual circumstances
constituting the fraud.  See Rule 9(b), Fed. R. Civ. P.


        1.  Unlawful Conduct

     To constitute consumer fraud the business practice in
question must be misleading and stand outside the norm of
reasonable business practice in that it will victimize the
average consumer.  New Jersey Citizen Action v. Schering-Plough
Corp., 842 A.2d 174, 177 (N.J. Super. Ct. App. Div. 2003).

_____

        [9]  Some claims under the CFA may not require pleadings
complying with Rule 9(b).  Not every such claim involves an
affirmative misrepresentation or material omission.  Intent is
also not an essential element for proving that an affirmative
unlawful act caused an ascertainable loss.  Cox v. Sears Roebuck
& Co., 647 A.2d 454, 462 (N.J. 1994).  And, unlike ordinary fraud
claims, a plaintiff pursuing an action pursuant to the Consumer
Fraud Act need not prove reliance.  However, the gravamen of the
claim in this case is that the consumer was improperly led to
purchase a product because of a false or misleading claim on the
part of the seller.  Given that Rule 9(b) is meant to protect the
reputations of manufacturers in just these circumstances, the
Court will apply the Rule to this claim of consumer fraud.

23

Defendants argue that their labels were literally true, if understood to refer to either the old formulation of the regular tomato soup or to an average of condensed soups, and therefore the labels cannot constitute unlawful conduct.

Defendants' argument lacks merit. First, the key factual premises of Defendants' argument rely on information outside the scope of this motion, including facts about the introduction of the reformulated soup. And second, even if the Court could consider the facts Defendants ask it to consider, the fact that the labels were literally true does not mean they cannot be misleading to the average consumer. See Miller v. American Family Publishers, 663 A.2d 643, 648 (N.J. Super. Ch. 1995) (upholding claim even though "Defendant [was] correct that a careful, literal reading of the quoted language reveals that the words do not actually say what plaintiffs claim they are intended to convey"); Union Ink Co., Inc. v. AT&T Corp., 801 A.2d 361, 379 (N.J. Super. Ct. App. Div. 2002). The Consumer Fraud Act protects consumers from unfair practices "even when, a merchant acts in good faith." Cox v. Sears Roebuck & Co., 647 A.2d 454, 461 (N.J. 1994). Neither the face of the pleadings nor any of Defendants' legal arguments present a basis for the Court to doubt the plausibility of the claim that reasonable consumers would have understood "REGULAR CONDENSED SOUP" in the context in which it appears to refer to Campbell's regular tomato soup and

would have understood "OUR REGULAR PRODUCT" to refer to the 480 mg sodium regular tomato soup.  The claims of misleading representations are therefore sufficient to satisfy the first prong of the Consumer Fraud Act test for the purposes of this Rule 12(b)(6) motion.

   2.   <u>Ascertainable Loss</u>

   The CFA does not define "ascertainable loss" and there is no relevant legislative history.  <u>Thiedemann v. Mercedes-Benz USA, LLC</u>, 872 A.2d 783, 792 (N.J. 2005).  According to Defendants, using a misrepresentation to cause a consumer to purchase a product does not cause an ascertainable loss.  Indeed, according to Defendants, being fraudulently induced into purchasing a product is not even an injury sufficient to confer standing under Article III of the Constitution.  As explained below, Defendants are incorrect.  Misrepresenting a product in order to get a consumer to purchase it does cause an injury, and what New Jersey Courts require for that loss to be "ascertainable" is for the consumer to quantify the difference in value between the promised product and the actual product received.

   The New Jersey Supreme Court has repeatedly and explicitly endorsed a benefit-of-the-bargain theory under the Consumer Fraud Act that requires nothing more than that the consumer was misled into buying a product that was ultimately worth less to the

consumer than the product he was promised.  See Thiedemann, 872 A.2d at 795 n.8; Furst v. Einstein Moomjy, Inc., 860 A.2d 435, 442 (N.J. 2004).  Although it is often the case that the difference between the promised product and the product actually received is some defect or flaw in the product, there is no requirement that the product actually received be defective or deficient in any way other than that it is not what was promised.  See Union Ink Co., Inc. v. AT&T Corp., 801 A.2d 361, 379 (N.J. Super. Ct. App. Div. 2002) ("An ascertainable loss occurs when a consumer receives less than what was promised."); see also Elias v. Ungar's Food Products, Inc., 252 F.R.D. 233, 248 (D.N.J. 2008); Miller v. American Family Publishers, 663 A.2d 643, 655 (N.J. Super. Ch. 1995) ("[T]o satisfy the 'ascertainable loss' requirement, a plaintiff need prove only that he has purchased an item partially as a result of an unfair or deceptive practice or act and that the item is different from that for which he bargained.").  If a manufacturer promises a car with all the features of a Formula One racecar and delivers an ordinary minivan, the consumer's fraud claim is not foreclosed by the fact that the minivan runs fine, and many people choose it for its great interior space.

A plaintiff alleging a benefit-of-the-bargain states a claim if he or she alleges (1) a reasonable belief about the product induced by a misrepresentation; and (2) that the difference in

26

value between the product promised and the one received can be reasonably quantified.

### i.  Expectation based on a representation

First, the plaintiff must allege a reasonable expectation about the product induced by a misrepresentation, and that this expectation was not met.  A consumer has not experienced any injury if the consumer merely has some expectation about a product that is not met.  Koronthaly v. L'Oreal USA, Inc., 374 Fed. App'x 257, 259 (3d Cir. 2010).  A consumer who expects a car that never requires resort to its comprehensive warranty, see Thiedemann, 872 A.2d at 789, or who expects the life of a toner cartridge to be linked precisely to the amount of toner in the cartridge, see Arcand v. Brother Intern. Corp., 673 F. Supp. 2d 282, 300-01 (D.N.J. 2009), has not experienced a loss when that expectation is not met.  But if the consumer received a product that "was worth objectively less than what one could reasonably expect," then that type of defeated expectation is an injury. See Koronthaly 374 Fed. App'x at 259 (emphasis added); Union Ink, 801 A.2d at 379 (N.J. Super. Ct. App. Div. 2002).[10]

---

[10]  Defendants rely on an ambiguous standalone sentence of dicta from Levy v. Keystone Food Products, Civil Action Nos. 07-5502, 08-1277, 08-1554, 2008 WL 4115856 (E.D. Pa. Aug. 28, 2008), for the proposition that a purchase that is fraudulently induced is not an injury.  In that case, the court noted that "[t]he fact that plaintiffs might have foregone purchasing Veggie Booty or Pirate's Booty had they known the true fat and caloric

When the basis of the reasonable expectation about the product is a misrepresentation made by the seller, the Consumer Fraud Act requires a direct causal connection between the misrepresentation and the plaintiff's defeated expectations about the product.  Under New Jersey law, misrepresentations made to the public generally but not the plaintiff do not bear a sufficient nexus to an individual plaintiff's purchase and loss to satisfy the Consumer Fraud Act, even though the misrepresentations may inflate the price of a product.  In re Schering-Plough Corp. Intron/Temodar Consumer Class Action, No. 2:06-cv-5774 (SRC), 2009 WL 2043604, *31 (D.N.J. 2009) (citing IUOEL 68, 929 A.2d 1076).  The plaintiff has to plead that the misrepresentation was made to him or her individually.  See Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc., 929 A.2d 1076 (N.J. 2007) (relying on Kaufman v. i-Stat Corp., 754 A.2d 1188 (N.J. 2000)).[11]

_____

content does not fit the Supreme Court's baseline injury-in-fact requirements."  Id. at *7.  It is not clear that the Court meant by this dicta what Defendants interpret it as, but even if the Levy court intended to state that a fraudulently induced purchase is not an Article III injury, this Court is neither bound nor persuaded by that determination.

   [11] Defendants rely on Schering-Plough to maintain that New Jersey courts do not recognize benefit-of-the-bargain losses under the Consumer Fraud Act.  But the parts of Schering-Plough cited by Defendants discuss the RICO claim in that case, about which the court held that  misrepresentations inducing purchases are not a cognizable injury under RICO because RICO does not permit such expectation-based damages.  As the New Jersey Supreme Court has repeatedly made clear, the Consumer Fraud Act does

In this case, Plaintiffs' expectations for the product are reasonable and have a direct connection to the misrepresentation. Plaintiffs allege that they were misled into thinking that the more expensive less-sodium soups contained significantly less sodium that the cheaper regular tomato soup because of the labels on each less-sodium soup bought (and in some cases because of the website), and were therefore willing to pay more for the less-sodium soup. (E.g., Am. Compl. ¶ 4 ("She purchased the cans after viewing misleading statements and representations on the labels of the cans which led her to believe that the Campbell's 25% Less Sodium Tomato Soup had 25% less sodium than Campbell's Regular Tomato Soup, and was therefore worth paying the extra cost."))   It is a plausible inference from the facts alleged that it was reasonable for Plaintiffs to expect that the soups they were receiving had 25%-30% less sodium than the regular tomato soup, when the soups in fact had approximately the same amount of sodium.

ii.  Valuing loss

The other element a plaintiff bringing a benefit-of-the-bargain claim must satisfy is quantification of the difference in value between the product received and the product promised.

permit such expectation damages.  Thiedemann, 872 A.2d 795 n.8; Furst v. Einstein Moomjy, Inc., 860 A.2d 435, 442 (N.J. 2004).

Arcand v. Brother Intern. Corp., 673 F. Supp. 2d 282, 301 (D.N.J. 2009) (quoting Romano v. Galaxy Toyota, 945 A.2d 49 (N.J. Super. Ct. App. Div. 2008)); Furst, 860 A.2d at 441-42.  Failure to quantify this difference in value results in the dismissal of a claim.  See, e.g, Solo v. Bed Bath & Beyond, Inc., Civil No. 06-1908 (SRC), 2007 WL 1237825, at *3 (D.N.J. April 26, 2007) (dismissing claim because "Plaintiff fails to specifically allege that what he did received was of lesser value than what was promised.").

The New Jersey Supreme Court's opinion in Thiedemann is instructive on this point.  See generally 872 A.2d 783.  That case involved Mercedes-Benz vehicles with a defective fuel gauge. Id. at 786.  Because Mercedes repaired the defects for free, the trial court dismissed the claim, finding that the plaintiffs asserted "an inchoate and unsubstantiated loss of the benefit of the bargain," and that "[t]he motion record contains neither expert proof of diminution of value of any of plaintiffs' property or objective expectations."  Id. at 789.  The plaintiffs persuaded the appeals court that "the mere possibility that the fuel gauge defect may be present in replacement parts used in the repair of plaintiffs' vehicles rendered it likely that the problem could recur."  Id. at 790.  Reversing the appellate division, the New Jersey Supreme Court held that a loss in value can be an "ascertainable loss" only when it is "supported by

30

sufficient evidence to get to the factfinder," and therefore the plaintiff "must proffer evidence of loss that is not hypothetical or illusory" and that is "presented with some certainty demonstrating that it is capable of calculation." Id. at 792-93. Plaintiffs had not proven with sufficient certainty that the car was worth less because of a defect which was repaired for free, and if so by how much.  Id.  The New Jersey Supreme Court was careful to add that "[w]e do not suggest that a benefit-of-the-bargain claim cannot support an ascertainable loss sufficient to allow a CFA claim to proceed to the factfinder; rather, it is the quality of the proofs that will determine a claim's viability." Id. at 795 n.8.

    Unlike the plaintiffs in Thiedemann and the cases upon which Defendants rely, Plaintiffs in this case do not claim their injury is the entire purchase price of the misrepresented soups, nor do they assert some inchoate or undefined harm.[12]  Instead,

_____

    [12]  Most of the cases cited by Defendants involve plaintiffs that made no attempt whatsoever to quantify the difference between the value of the product received and the one promised. See Franulovic v. Coca Cola Co., Civil Action Nos. 07-539 (RMB), 07-828 (RMB), 2007 WL 3166953, at *11 (D.N.J. Oct. 25, 2007) ("She has not alleged when she purchased Enviga or for what price . . . which advertising enticed her to buy Enviga, her expectations for Enviga based on the advertising, or Enviga's failure to live up to those expectations."); Mason v. Coca-Cola Co., Civil Action No. 09-0220-NLH-JS, 2010 WL 2674445, at *7 (D.N.J. June 30, 2010) ("Plaintiffs do not allege, however, that what they received was of lesser value than what they were promised."); Shelton v. Restaurant.com Inc., Civil Action No. 10-0824 (JAP), 2010 WL 2384923, at *4 (D.N.J. June 15, 2010) ("the pleadings are devoid of any facts which quantify or measure

Plaintiffs in this case assign a value to the thing promised (the price Plaintiffs willingly paid when they thought the soup contained less sodium than the cheaper alternative) and subtract the value of the equivalent for their purposes of the product actually received (the price of the regular tomato soup).  As explained below, this methodology is sound and complies with the Consumer Fraud Act's requirement for ascertainable loss.

The difference in value between the product received and the product promised is not only the measure of damages in a benefit-of-the-bargain Consumer Fraud Act claim, but also the measure of damages under an ordinary product warranty case.  See Furst, 860 A.2d at 441-42 (quoting N.J. Stat. Ann. § 12A:2-714(2)).  This is no coincidence.  New Jersey courts look to contract law to guide the interpretation of "ascertainable loss" in benefit-of-the-bargain claims under the Consumer Fraud Act.  Furst, 860 A.2d at 441-42 (N.J. 2004).

Under the Consumer Fraud Act, as in contract law, there are

what loss was suffered"); In re Ford Motor Co. E-350 Van Products Liability Litigation (No. II), Civil Action No. 03-4558 (GEB), 2010 WL 2813788, at *28 (D.N.J. July 9, 2010) ("The allegations set forth by the New Jersey Plaintiffs are replete with generalized statements concerning loss; however, the evidence submitted by the New Jersey Plaintiffs contains no specific proofs such that the losses could be quantified or measured."); Shannon v. Howmedica Osteonics Corp., Civil Action No. 09-4171 (JLL), 2010 WL 421096, at *3 (D.N.J. Feb. 1, 2010) (citing Parker v. Howmedica Osteonics Corp., Civil Action No. 07-02400 (JLL), 2008 WL 141628, at (D.N.J. Jan. 14, 2008) (holding that allegation of purchase price, without other comparison information, is not enough).

many possible ways to prove the difference in value between the product received and the product promised.  Often, plaintiffs will calculate the difference by reference to the market price of making the product actually received like the one warranted, either by modification or replacement.  See, e.g. Talalai v. Cooper Tire & Rubber Co., 823 A.2d 888, 899 (N.J. Super. Ct. L. Div. 2001); Furst, 860 A.2d at 441-42.[13]

Plaintiffs propose a perfectly acceptable alternative for valuing the difference between the product promised and the one received for this case in which neither replacement nor modification would be useful for calculating the values.  They compare the price they paid for the product as it was represented to the price of a product that is the equivalent for Plaintiffs' purposes of the product actually received.  Cf. Lamond v. Pepsico, Inc., Civil No. 06-3043 (RMB), 2007 WL 1695401, at *7

---

[13] In principle, expectation damages are based on the plaintiff's personal assessments of value, not the aggregated valuations represented by the market price for something.  See, e.g. West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC, C.A. No. 2742-VCN, 2009 WL 458779, at *4 (Del. Ch. Feb. 23, 2009) (citing Restatement (Second) of Contracts § 347 cmt. b (1981) and E. Allan Farnsworth, Contracts § 12.8 (4th ed. 2004)).  But two factors generally result in the market price being the measure of value.  First, like the Consumer Fraud Act, contract law requires the values to be reasonably capable of proof, see Thiedemann, 872 A.2d at 792-93; Restatement (Second) of Contracts § 352 (1981), and market prices are easier to prove than subjective valuations. Second, rules of cover and mitigation require the plaintiff to seek a replacement item when possible in the open market, leading to the fair market value operating as a ceiling in the absence of proof of special value.

(D.N.J. June 8, 2007) (rephrasing N.J. Stat. Ann. § 12A:2-714's measure of damages as "the amount paid for the product less the value of the product received").

Just as the approach to valuation that examines replacement or modification cost does not require the plaintiff to have actually paid for the replacement or modification, see Cox, 647 A.2d at 464 ("The victim is not required actually to spend the money for the repairs before becoming entitled to press a [Consumer Fraud Act] claim."), Plaintiffs' approach does not require the plaintiff to plead that he or she would actually have purchased the product used as the basis for comparison.  These are approaches to valuing an injury; they are not the injury itself.  Moreover, the valuations do not have to be perfect. They need only provide a reasonable basis for valuation that is not speculative or unquantified.  See Arcand, 673 F. Supp. 2d at 300-01 (holding that plaintiffs cannot leave the court to speculate about whether what a plaintiff received was worth less than what a defendant promised); Restatement (Second) of Contracts § 352 cmt. a (1981) ("Damages need not be calculable with mathematical accuracy and are often at best approximate.")

In the present case, the determination of "ascertainable loss" may be a simple matter.  To Plaintiffs, the only salient difference between the soup they bought thinking it to be a less-sodium tomato soup and the regular tomato soup is the label; the

misrepresentation thus caused ascertainable loss of the difference in retail price between what they paid for (less-sodium soup) and what they got (soup equivalent for their purposes to regular tomato soup).  Plaintiffs' approach to valuation need not assume that the prices of these products are the result of every consumer being concerned about the same product characteristics as Plaintiffs, because the prices are not being used to show how much the market values certain amounts of sodium, but are instead being used to objectively measure the values to Plaintiffs of the product promised and product received.  A reasonable reading of the Amended Complaint is that, according to Plaintiffs, the soup they paid for is identical, for their purposes, to soup that is 20 to 80 cents cheaper, and they bought it based on a misrepresentation.  A reasonable fact-finder could therefore conclude that the reasonably calculated value to Plaintiffs of the item actually received was 20 to 80 cents less than the value of the item promised.  That is a sufficient allegation of ascertainable loss under New Jersey law.

It is difficult to imagine a way to value food products more precisely or objectively at the pleading stage than by the kind of comparison Plaintiffs employ.  Plaintiffs have alleged a specific and definite basis for assessing the difference in value between the product promised and the one received that is at least plausible and that permits the court to calculate loss with

a reasonable degree of certainty.  To ask for more than this from Plaintiffs in the pleadings would be asking more than the Consumer Fraud Act and the Federal Rules of Civil Procedure require for pleadings.

### D.  **Express Warranty Claims**

To plead a claim for breach of express warranty, a plaintiff must set forth facts sufficient to support a plausible inference that (1) Defendant(s) made an affirmation, promise, or description that became part of the basis of the bargain, and (2) the goods ultimately did not conform to the affirmation, promise, or description.  New Hope Pipe Liners, LLC v. Composites One, LCC, Civ. No. 09-3222, 2009 WL 4282644, at *5 (D.N.J. Nov. 30, 2009).  Defendants' only arguments with respect to Plaintiffs' express warranty claim are the same arguments made with respect to the Consumer Fraud Act claim:  that there is no misrepresentation and no injury.  These arguments are meritless as to this claim just as they were meritless with respect to the Consumer Fraud Act claim.  Defendants' argument as to the accuracy of the labels assumes facts not pleaded or relied upon in the Amended Complaint (the timing of the release of the labels and reformulated regular tomato soup), and assumes without any support that literally true but misleading representations cannot provide the basis for a claim.  And Plaintiffs' pleadings

36

adequately allege a sufficiently quantifiable injury, as explained at length above.

### E.  Particularity of Pleadings

Plaintiffs must identify enough information about the misrepresentations and product transactions to satisfy Rule 9(b) of the Federal Rules of Civil Procedure for each of their claims. See In re Toshiba America HD DVD Marketing and Sales Practices Litigation, Civ. No. 08-939 (DRD), 2009 WL 2940081 at *13 (D.N.J. Sept. 11, 2009) (finding insufficient particularity because the plaintiffs failed to allege where and when they made purchases, how much they paid, how much the product their received was worth, when misrepresentations were, and when the plaintiffs were exposed to them).  But the law does not require specificity just for specificity's sake.  The level of particularity required is sufficient details to put Defendants on notice of the "precise misconduct with which they are charged." Franulovic, 2007 WL 3166953, at *11.  In other words, "[t]o satisfy the specificity requirement of Fed. R. Civ. P. 9(b) the pleadings must state what the misrepresentation was, what was purchased, when the conduct complained of occurred, by whom the misrepresentation was made, and how the conduct led plaintiff to sustain an ascertainable loss." Zebersky v. Bed Bath & Beyond, Inc., No. CIVA 06-CV-1735 PGS, 2006 WL 3454993, at *4 (D.N.J. Nov. 29, 2006).

37

1. <u>Claims based on labels</u>

The misrepresentation underlying these claims is the
misleading reference food comparator on each label of the soup.
What was purchased was soup that Plaintiffs thought was
comparable to Campbell's regular tomato soup but significantly
lower in sodium.  The conduct complained of occurred between
September 1, 2009 and the filing of the Amended Complaint, and
the conduct led to an ascertainable loss because Plaintiffs
received a product worth 20 to 80 cents less than the soup they
agreed to pay for.  That is all the information that is required
at this stage.

Defendants argue that since Plaintiffs fail to specify
whether they saw the label of the 480 mg regular tomato soup
before purchasing the less-sodium soups that Plaintiffs therefore
do not sufficiently allege that they were misled.  But the
statements on the labels can be misleading even to a consumer who
did not know the sodium content of the 480 mg regular tomato
soup.  If a manufacturer represents that a higher-priced
television has a 25% higher resolution than the manufacturer's
regular 50" television, when in fact the two have the same
resolution, it is not necessary for the misled consumer to know
that the regular 50" television also had 1920 x 1080 resolution
in order for the consumer to have been misled by the claim.

38

Defendants would engraft a requirement upon the New Jersey Consumer Fraud Act and the law of express warranty that requires consumers to examine the comparable product in order to determine whether to accept the seller's representations about the comparison.  No case has ever so held, and such a theory would turn New Jersey's protective laws upon their head.

Relatedly, Defendants argue that Plaintiffs must specify the stores from which they bought the less-sodium soups and the dates of purchase so that Defendants know if the stores were selling the reformulated 480 mg soup and not the older 710 mg soup.  If the Amended Complaint were to be evaluated in light of facts alleged by Defendants' counsel, then this argument might be correct — perhaps Plaintiffs could not have reasonably read the comparison claims to refer to a product that was not yet for sale.  However, whether and when there was a change in sodium content of the regular tomato soup is an issue outside the scope of the pleadings and this motion.  Plaintiffs are not required to plead their claims in such a way as to answer all relevant questions about liability that Defendants might have based on facts known to Defendants.  Plaintiffs' pleadings are not drafted by clairvoyants who must anticipate possible defenses that could be raised.  Defendants will have ample opportunity to obtain discovery of relevant facts and, if appropriate, through contention interrogatories.

39

2.  <u>Website claims</u>

Defendants characterize Plaintiffs' allegations about the website as not stating whether Plaintiffs even viewed the relevant page, and not stating whether that misrepresentation caused Plaintiffs to purchase the higher-priced soup.  But at least one named Plaintiff alleges that she purchased the higher-priced soup "after viewing misleading statements and representations on the labels of the cans and Campbell's website which led her to believe that the Campbell's 25% Less Sodium Tomato Soup had 25% less sodium than Campbell's regular tomato soup."  (Am. Compl. ¶ 7.)  Reading the Amended Complaint as a whole, this allegation is reasonably read as being that Plaintiff Velez viewed the misleading statement identified by Plaintiffs in paragraph 27, and that this was part of what caused her to buy the higher-priced soup.  For her, at least, the allegation is sufficiently particular.

None of the other named Plaintiffs makes a sufficiently detailed allegation regarding the misrepresentations on the website.  This means that some of the named Plaintiffs will not be able to rely on that factual basis for their claims under the Consumer Fraud Act and common law of contracts; these Plaintiffs will instead be forced to rely on their allegations regarding the labels alone.  To the extent this raises issues with respect to

40

the class nature of this suit, those issues will be taken up when a class certification motion is filed.

### 3.   Marketing materials claims

To the extent that Plaintiffs base their claims on misrepresentations made in unidentified "marketing materials," this basis for the claims is not pleaded with sufficient particularity.  Defendants are given no notice about which marketing materials are alleged to be misleading or how precisely they are misleading.

**F.  Parent Company Liability**

Finally, Defendants argue that Plaintiffs failed to allege any facts suggesting that Campbell Soup Company took any of the actions at issue in this matter.  But Plaintiffs do allege that the "Campbell Soup Company marketed and sold its 25% Less Sodium Tomato Soup and the 30% Less Sodium Healthy Request Tomato Soup, throughout the United States during the Class Period." (Am. Comp. at ¶ 9).  Indeed, the soup labels themselves refer only to Campbell Soup Company.  Plaintiffs also allege that Campbell Soup Company and the Campbell Sales Company engaged in a common plan and scheme to deceive soup consumers through the use of misleading representations on the soup labels and website.  (Id. at ¶¶ 1, 2, 16, 55).  It is entirely plausible that both companies were involved in the creation or approval of labeling,

41

creation or approval of other marketing and the website, and the timing of release and sale price of the various soups. Defendants also maintain in a footnote of the brief supporting the motion to dismiss that service upon Campbell Sales Company was improper, but neither entity makes a motion pursuant to Rule 12(b)(5) or provides the grounds for such a motion.  Accordingly, claims against the Campbell Soup Company will not be dismissed on this ground.

## IV.  CONCLUSION

Some of the theories supporting Plaintiffs' claims are either insufficiently pleaded or preempted.  The allegations regarding unspecified "marketing materials" and Defendants' website are insufficiently pleaded under Rule 9(b), Fed. R. Civ. P, except for Plaintiff Velez's allegations regarding the website, which are sufficient.  Additionally, the claims regarding omission of information from the labels are preempted by the FDCA's nutrition labeling requirements.  The rest of the allegations in the Amended Complaint, however, are pleaded with sufficient particularity and content to support claims under the New Jersey Consumer Fraud Act and for breach of express warranty that are not preempted by the FDCA's nutritional labeling requirements because these state law causes of action would impose no different labeling requirements than those in effect under the FDCA.

The accompanying Order will be entered.


**March 23, 2011**                    **s/ Jerome B. Simandle**
Date                                  JEROME B. SIMANDLE
                                      United States District Judge